DAYTON CLASSROOM TEACHERS ASSN., APPELLANT, *v.* DAYTON BOARD OF EDUCATION ET AL., APPELLEES.

(No. 74-141—Decided February 19, 1975.)

128

*Messrs. Griffith & Legler, Mr. James R. Kirkland, Messrs. Green, Schiavoni & Haines* and *Mr. Eugene Green,* for appellant.

*Messrs. Pickrel, Schaeffer & Ebeling, Mr. Thomas J. Harrington, Mr. David L. Hall, Messrs. Bieser, Greer & Landis* and *Mr. Leo F. Krebs,* for appellees.

WILLIAM B. BROWN, J.   Labor relations law in the public sector lacks uniformity from state to state.   For instance, that of Hawaii is regulated by an extremely comprehensive statutory scheme.[6]  Public labor relations Acts are present in an overwhelming majority of states,[7] but Ohio has none.  Some commentators argue that such Acts are an

---

[6]Hawaii Rev. Stat., Sections 89-1 *et seq.*

[7]Bargaining Units for State and Local Employees, 39 Mo. L. Rev. 187, 188 (Spring 1974).

anathema to democratic government,[8] whereas others believe that the adoption of such Acts only serves to deter public-sector collective bargaining which flourishes in the absence of such legislation.[9]

## I

This case presents two questions: (1) Whether a board of education may validly enter into a collective bargaining agreement and (2) whether a binding grievance arbitration clause in such agreement is valid and enforceable.

The board argues that the agreement is "extra-legal," an "understanding" rather than a contract, and, that even if it were a contract, it would be unlawful, constituting an improper delegation of the board's power.[10] Another implicit defect is that a binding contract would restrain the board from changing its policy at will.[11]

## II

The board's basic reason for failing to enter into arbitration is its belief that it lacks capacity to enter into, and become bound by, the agreement herein.

A board's contractual capacity, or power, is described in paragraph one of the syllabus of *Schwing* v. *McClure* (1929), 120 Ohio St. 335, as follows:

"Members of a board of education of a school district are public officers, whose duties are prescribed by law. Their contractual powers are defined by the statutory limi-

---

[8]Petro, Sovereignty and Compulsory Public-Sector Bargaining, 10 Wake Forest L. Rev. 25 (March 1974), which also presents an exhaustive discussion of public labor relations.

[9]Green, Concerted Public Employee Activity in the Absence of State Statutory Authorization:II, 2 J. Law & Educ. 419.

[10]We note that the board made a "pledge" while drafting the agreement that their representatives would be "clothed with all necessary power and authority to make proposals, consider proposals, and make concessions in the course of negotiations." Agreement, Article IV(J) of Appendix B, at page 79.

[11]More fully articulated in: Rezny, Legal Problems of School Boards, 123, Section 6.9.

tations existing thereon, and they have no power except such as is expressly given, or such as is necessarily implied from the powers that are expressly given."

In addition, it has been recognized that "* * * '[i]n democratic political systems dealings between public employers and public employee organizations—whether they are called negotiations or discussions—must necessarily be limited by legislatively determined policies and goals.' "[12]

Thus, the question becomes whether a board's attempt to bind itself to a written collective bargaining agreement exceeds statutory limitations placed upon its contractual power.

R. C. 3313.47 grants to a board of education the management and control of all public schools within its district. R. C. 3313.17 provides: "The board of education of each school district shall be a body politic and corporate, and, as such, *capable of * * * contracting and being contracted with * * *.*" (Emphasis ours.) The latter section is slightly modified by R. C. 3313.33, which provides that "[n]o contract shall be binding upon any board unless it is made or authorized at a regular or special meeting of such board."[13]

R. C. 3319.08 requires boards of education to "enter into *written contracts* for the employment and reemployment of all teachers." (Emphasis ours.)

Finally, a board of education is required to "make such rules and regulations as are necessary for its government and the government of its employees * * *." R. C. 3313.20.

From the foregoing, we conclude that a board of education has been granted broad discretionary powers in its dual role of manager of schools and employer of teachers.

Our research discloses that agreements entered into

---

[12]ABA Committee Report on State Labor Law, 1972-73, G.E.R.R. R. F., 61:201 (BNA 1974).

[13]The agreement provides that it shall be authorized sufficient to comply with this section. Agreement, Article V of Appendix B, at page 79, *infra*, at n. 20.

by boards of education are generally invalidated by courts upon unlawful-delegation grounds only when the board seeks to absolve itself of the duties acquired thereunder.

On the other hand, where a school board has benefited from an agreement and seeks to have it upheld, the courts generally apply normal principles of contract law to test the contract's validity and binding effect.

In one such case, this court held that a board of education is vested with discretionary authority to authorize one of its schools to join a private association wherein member schools were bound to "* * * abide by and conform to the constitution and rules, bylaws, interpretations and decisions of the association." *State, ex rel. Ohio H. S. Athletic Assn.,* v. *Judges of the Court of Common Pleas* (1963), 173 Ohio St. 239, 241.

In principle, we cannot distinguish that case from the one here under consideration. The issues presented in both cases are whether a school board may authorize entry into a pact, and whether decisions made by tribunals that administer the pact are binding on entities of the board of education. In *Athletic Assn.* this court answered both questions in the affirmative.

Accordingly, we hold that a board of education is vested with discretionary authority to negotiate and to enter into a collective bargaining agreement with its employees.

### III

Much of what has been said in part II concerning the validity of the agreement herein applies as well to the binding grievance arbitration clause.

In *Campbell* v. *Automatic Die & Products Co.* (1954), 162 Ohio St. 321, 329, this court observed that:

"It is the policy of the law to favor and encourage arbitration and every reasonable intendment will be indulged to give effect to such proceedings and to favor the regularity and integrity of the arbitrator's acts. * * *"

Arbitration is favored because its purpose is "to avoid

needless and expensive litigation." *Springfield* v. *Walker* (1885), 42 Ohio St. 543, 546.

We also recognize that the availability of arbitration may contribute to more harmonious relations between a school board and its employees,[14] and that factor fosters the public policy of keeping the schools open. Although teacher strikes are illegal in practically every state,[15] during the period July 1960 through June 1971, teacher strikes numbered 631 nationwide[16] and 72 in Ohio,[17] resulting in lost time of 5,955,689[18] and 51,434[19] man-days, respectively.

Against that backdrop, and finding no statutory prohibition against the subject arbitration clause, we reject appellees' contention that such clause is invalid and unenforceable.

We find that the following discussion of the Wisconsin Supreme Court applies with equal force to the case before us:

"The city has contended that to require the city to submit to binding arbitration is an unlawful infringement upon the legislative power of the city council and a violation of its home-rule powers. Yet in all of its arguments the city is talking about arbitration in the collective-bargaining context—arbitration to set the terms of a collective-bargaining agreement. Such is not this case, which involves arbitration to resolve a grievance arising under

---

[14]"* * * Labor difficulties like strikes, walkouts, slowdowns, etc., have been avoided or lessened because of the availability of arbitration. The public interest is best served in education, as well as other activities, if a means is found to resolve differences within the framework and language of a labor contract." *Local 953* v. *School Dist.* (Mich. Cir. Ct. 1967), 66 L. R. R. M. 2419, 2421.

[15]See R. C. 4117.01 *et seq.*; Livingston, Collective Bargaining and the School Board, in Zagoria, Public Workers and Public Unions, 72.

[16]National Education Association Memorandum on Teacher Strikes, Work Stoppages, and Interruptions of Service, 1970-71, G.E.R.R. R.F. 71:1055

[17]*Id.* at 71:1057

[18]*Id.* at 71:1055

[19]*Id.* at 71:1057

an existing agreement to which the city is a party. * * *"
*Local 1226* v. *Rhinelander* (1967), 35 Wisc. 2d 209, 220, 151
N. W. 2d 30. See, also, *State, ex rel. Fire Fighters Local
No. 946, I.A.F.F.,* v. *Laramie* (Wyo., 1968), 437 P. 2d 295;
*Harney* v. *Russo* (1969), 435 Pa. 183, 255 A. 2d 560; *War-
wick* v. *Warwick Regular Firemen's Assn.* (1969), 106 R. I.
109, 256 A. 2d 206.

## IV

Neither reason nor authority prohibits a board of
education from manifesting its policy decisions in written
form and calling the writing an agreement or contract. It
can not be seriously argued that entering into such agree-
ment is a departure from, or surrender of, independent exer-
cise of a board's policy-making power.[20]

Accordingly, it is the judgment of this court that the
agreement herein is a valid and enforceable contract, and
that the board is obligated to arbitrate any grievance aris-
ing thereunder where the grievance involves the applica-
tion or interpretation of a valid contractual term and the
arbitrator is specifically prohibited from making any deci-

---

[20]The agreement herein, by its own terms, *is* board policy. Agree-
ment, Article V of Appendix B, at page 79, reads:

"When a substantive agreement is reached, it shall then be made
in writing and submitted for ratification to the * * * [D.C.T.A.] and
then to the board of education. When approved by both parties, it
shall be signed by their respective presidents and shall be entered into
the official minutes of the board of education. Thereupon, *the agree-
ment shall constitute a revision of school policies.* Provisions of the
substantive agreement shall be reflected in the individual contract or
statement of conditions of service as submitted to employees." (Em-
phasis ours.)

Also, we agree with the New York Court of Appeals, that the
absence of such contract-making power must be proved by the board:

"* * * It is hardly necessary to say that, if the board asserts a
lack of power to agree to any particular term or condition of employ-
ment, it has the burden of demonstrating the existence of a specific
statutory provision which circumscribes the exercise of such power
* * *." *Board of Edn. of Union Free School Dist. No. 3 of Town of
Huntington* v. *Associated Teachers of Huntington* (1972), 30 N. Y. 2d
122, 130, 282 N. E. 2d 109.

sion which is inconsistent with the terms of the agreement or contrary to law.

Therefore, we affirm that part of the judgment of the Court of Appeals which holds the agreement valid, but we reverse that part of the judgment which holds the binding grievance arbitration clause invalid, and we remand the cause to the Court of Common Pleas for proceedings consistent with this opinion.

*Judgment affirmed in part and reversed in part.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, CELEBREZZE and P. BROWN, JJ., concur.